NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO K.T.

No. 1 CA-JV 23-0111
FILED 2-20-2024

Appeal from the Superior Court in Maricopa County
No. JD39673
The Honorable Suzanne S. Marwil, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Jennifer M. Perkins, and Judge David D. Weinzweig joined.

**J A C O B S,** Judge:

¶1 Loretta Tillman ("Mother") appeals the juvenile court's order severing her parent-child relationship with her daughter K.T. based on: (1) prolonged and chronic substance abuse under A.R.S. § 8-533(B)(3); and (2) fifteen-month out-of-home placement under A.R.S. § 8-533(B)(8). Mother argues the Department of Child Safety ("DCS") did not diligently seek to reunite her with K.T. because it failed to provide her with cognitive behavioral therapy ("CBT"), notice of K.T.'s medical appointments and therapies, and inpatient substance abuse treatment. Because the court's order finds, based on reasonable evidence, that DCS diligently provided the services needed to remedy the conditions that led to K.T.'s out-of-home placement, we affirm the court's severance order.

## FACTS AND PROCEDURAL HISTORY

### A. After K.T. Was Born Substance-Exposed, DCS Placed Her in a Group Home and Then Filed a Dependency Matter.

¶2 Mother and Caesar Parks ("Father") are K.T.'s biological parents. K.T. was born on May 31, 2020. In June 2020, DCS received a report that K.T. was born exposed to oxycodone, methadone, and marijuana, and was experiencing withdrawal. The report explained that K.T. remained in the neonatal unit for forty-seven days because of withdrawal. Mother visited twice. K.T. was discharged with gastric intubation and oxygen. On July 22, 2020, DCS took custody of K.T., and placed her in a group home.

¶3 On July 27, 2020, DCS filed a petition seeking to determine paternity and to order payment of child support, and asking that K.T. be declared dependent as to her Mother and Father. The juvenile court found K.T. dependent as to both parents, and set a case plan of family reunification to address the issues giving rise to the dependency – Mother's substance abuse and domestic violence.

### B. Mother Participated Inconsistently in Services DCS Recommended to Reunify Her with K.T., While Struggling with Sobriety.

¶4 DCS provided Mother with a variety of family reunification services, as the case plan required, including domestic violence counseling, individual counseling, substance abuse treatment, and substance abuse aftercare.

**¶5**     DCS periodically provided Mother with domestic violence counseling. For example, in June 2022, after Mother expressed that she was in a violent relationship with Father, DCS referred Mother to domestic violence counseling and she attended.

**¶6**     DCS provided Mother with extensive substance abuse services. Mother's participation in substance abuse related services was mixed, as she struggled with her sobriety during the case plan. Mother engaged in some substance abuse testing from July to September 2020. She completed three more substance abuse tests in 2021. In March 2022, Mother completed a substance abuse test and DCS referred Mother to more substance abuse treatment services. In October 2022, Mother's substance abuse services closed after she tested only three times between March 2022 through October 2022. After Mother and Father ended their relationship in November 2022, Mother returned to engaging in services more consistently.

**¶7**     At times, Mother's struggles with sobriety interfered with the case plan. In August 2022, Mother had used a substance when she visited K.T. at the group home. The staff at the group home reported that Mother was "making out of the ordinary statements" and under the influence.

**¶8**     DCS supported Mother visiting K.T., but there were difficulties. By August 2022, DCS had sought and received permission to transfer K.T. from a group home to foster care because her medical conditions had stabilized. DCS then arranged for Mother to have supervised visits with K.T. Mother cancelled the first scheduled visit on October 6th. Mother attended the supervised visit on October 20th but failed to show up to K.T.'s supervised visit on October 28th. The supervised visitation provider was unsuccessful in contacting Mother at her provided telephone and email. In November 2022, the supervised visitation provider tried to cancel its own participation in these visits due to Mother's inconsistency, but DCS requested more supervised visits.

**¶9**     During most of the case plan, through August 2022, K.T. was in a group home, and DCS provided Mother with notice of and invitations to all of K.T.'s medical appointments. After K.T. was transferred to foster care, Mother stopped receiving notice of or invitations to K.T.'s medical appointments. In December 2022, the court changed the case plan from family reunification to severance and adoption. Thus, for the last three months of the time the case plan was reunification, Mother was not invited to K.T.'s medical appointments. But as DCS correctly notes, DCS had not alleged that any failure by Mother to attend medical appointments or to tend to K.T. prevented Mother from exercising proper parental care or

control. Father did not assign blame to DCS for not providing information about appointments, given K.T.'s change to foster care.

¶10    DCS provided Mother with individual counseling with a component of CBT. DCS's examining psychologist found Mother "would benefit from individual counseling that is supportive in nature, as well as having a solid component of cognitive behavioral interventions within this structure." In November and December 2022, Mother received counseling from three separate providers, including Chrysalis, Valle del Sol, and Terros. Mother's counseling services at Terros included components of CBT.

¶11    Given Mother's continuing struggles, DCS moved to terminate her parent-child relationship with K.T. in January 2023. Between January and March 2023, Mother tested positive for substances four times. Because Mother's tests demonstrated substance abuse, Terros recommended Mother receive more comprehensive care. Mother told her Terros counselor she was going to check into a particular facility, but Terros later learned Mother never arrived for treatment. Mother then participated in, but did not complete, a methadone detox program.

¶12    In March 2023, three weeks before the severance trial, Terros recommended Mother seek inpatient substance abuse treatment. DCS gave Mother a list of three service providers, noting that others had found success with them. As a DCS case manager testified, the time before trial was too short to get Mother placed at a residential treatment center.

### C.    After a Trial in April 2023, the Court Severed Mother's Parent-Child Relationship with K.T.

¶13    In April 2023, the juvenile court held a severance hearing. Mother testified that she was substance dependent but committed to being a more stable parent. Mother testified she was aware of K.T.'s special needs and that K.T.'s needs required a sober parent. Mother argued that DCS had failed to provide her with reasonable efforts to reunify her family.

¶14    The court terminated Mother's relationship based on prolonged and chronic substance abuse under A.R.S. § 8-533(B)(3) and fifteen-month out-of-home placement under A.R.S. § 8-533(B)(8). As to A.R.S. § 8-533(B)(3), the court found Mother had a history of chronic substance abuse, was thus unable to meet daily parenting responsibilities, and that there were reasonable grounds to believe this condition would continue for a prolonged indeterminate period. The court likewise found

K.T. had been in out-of-home placement for longer than fifteen months under A.R.S. § 8-533(B)(8).

¶15          As to the subjects of this appeal, the court found DCS made diligent efforts to provide a variety of reunification services, including domestic violence services, parenting classes, substance abuse services, visitation, and transportation. Challenging the finding of diligent efforts, Mother timely appealed. We have jurisdiction under A.R.S. §§ 8-235, 12-120.21(A), and 12-2101(A)(1), and Article 6, Section 9 of the Arizona Constitution.

## DISCUSSION

I.      **DCS's Arguments That We Should Not Reach the Merits of Mother's Arguments About Services Both Fail.**

A.      **Mother Did Not Waive Her Argument That DCS Failed to Diligently Provide Her With Reunification Services.**

¶16          DCS argues Mother waived her challenge to the adequacy of its reunification efforts by not raising the issue before her severance trial, citing *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345 (App. 2013). *Bennigno R.* does not aid DCS. There, a parent waived his challenge to the adequacy of services when he acquiesced in findings in the juvenile court that DCS "ha[d] made diligent efforts to provide appropriate reunification services" to him and also failed to raise the issue in his closing argument at the severance trial, when he argued "the sole issue for the court to decide was . . . the children's best interests." *Id.* at 349-50 ¶ 19. Here, Mother raised the issue during the second and third days of the severance proceeding.

¶17          Both parties refer us to *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, which, like *Bennigno R.*, stands for the proposition that when a party fails altogether to raise DCS's diligence in providing reunification services to the juvenile court, they waive it. 234 Ariz. 174, 179 ¶ 16 (App. 2014). Because Mother raised the issue below, neither case establishes waiver here.

¶18          More helpful is our unpublished decision in *Trina C. v. Dep't of Child Safety*, 1 CA-JV 14-0339, 2015 WL 3540191, at *3 ¶ 12 (App. June 2, 2015) (mem. decision), to which we turn given the absence of a more closely analogous published decision. *See* Ariz. R. Sup. Ct. 111(c) (defining circumstances in which unpublished decisions may be cited). *Trina C.* cites and relies upon *Shawanee S.*, and clarifies that although the mother had raised the question of DCS's diligence in providing services on the last day of her severance hearing, she nonetheless preserved the objection. *Id.*

("[W]e concluded that the parent in *Shawanee S.* waived that objection because it was never raised in the juvenile court. Here, Mother raised the objection, albeit on the last day of the severance trial.") (cleaned up).

**¶19** We see no waiver here, a conclusion strengthened by the constitutional nature of Mother's right. *See Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581 ¶ 18 (2021) (explaining that right to reunification services in context of severance is constitutional in nature); *Matter of Appeal in Maricopa Cnty., Juv. Action No. JT9065297*, 181 Ariz. 69, 73 (App. 1994) ("Arizona courts indulge every reasonable presumption against a waiver of fundamental constitutional rights.").

> **B.    DCS Waived its Argument That We Should Not Consider its Diligence Because Providing Mother With Additional Reunification Services Would Be Futile.**

**¶20** DCS argues the record supports a finding that providing additional services would have been futile. But DCS argues futility for the first time on appeal. As Mother correctly notes, it never sought a ruling it was allowed to stop providing services under A.R.S. § 8-846(D) or its procedural companion, Rule of Juvenile Court Procedure 340(a)(1). DCS confirms it never raised the argument below by declining to suggest it did so, and by inviting us to engage in factfinding as the first decider of the issue. By not raising the argument below, DCS waived it. *See Shawanee S.*, 234 Ariz. at 179 ¶ 16 (explaining party must raise objection to preserve it). DCS also asks us to search the record for evidence services would have been futile, citing *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 49-50 ¶ 15 (App. 2004). Because we next find DCS diligently provided Mother with reasonable services, we decline to reach that issue.

**II.    DCS Diligently Provided Mother with Reunification Services, as Was Necessary to Support the Juvenile Court's Severance Order.**

**¶21** Mother challenges the juvenile court's finding that DCS diligently provided Mother with family reunification services. This court accepts the juvenile court's factual findings "if reasonable evidence and inferences support them." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478 ¶ 30 (2023) (citing *Jessie D.*, 251 Ariz. at 579-80 ¶ 10) (cleaned up).

A. **Because K.T.'s Out-of-Home Placement Flowed From Substance Abuse and Domestic Violence, a Brief Interruption in Notices of Medical Appointments That Did Not Address Those Issues Did Not Violate Mother's Rights.**

¶22 Mother argues DCS failed to provide her with services when it stopped notifying Mother of K.T.'s medical appointments and inviting her to them after K.T. moved to a foster home. Mother points out it was not her burden to demand notifications of appointments, and notes the importance to her of K.T's special needs. DCS counters that providing Mother with the opportunity to learn about K.T.'s medical condition was not a reunification service in the context of this case because it was not the basis for K.T.'s out-of-home placement.

¶23 DCS is right. The central reason for K.T.'s out-of-home placement was Mother's substance abuse and domestic violence. DCS's obligation was thus to provide her with reunification services designed to resolve those conditions. *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (explaining DCS must provide a parent with services to help them become an effective parent). The court found DCS did so. The record supports its conclusion that DCS diligently and reasonably referred Mother to domestic violence counseling, substance abuse assessment, substance abuse treatment, and a substance abuse aftercare program. All of those referrals and services address the issues that threatened the family unit in the first place, as the law and our federal constitution required of DCS. *See id.*

B. **DCS Provided Mother with Reasonable Mental Health Services by Including a Component of CBT in Her Individual Counseling.**

¶24 Mother argues providing her with CBT was the "primary recommendation" of DCS's expert, so that by failing to provide her with it, DCS failed to diligently provide her with reunification services. *See Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96 ¶ 29 (App. 2009) ("ADES fails to make a sufficient effort to reunify a family 'when it neglects to offer the very services that its consulting expert recommends.'") (quoting *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192 ¶ 37 (App. 1999)).

¶25 This argument fails because of two facts. First, the examining psychologist did not recommend CBT as such, but rather, that Mother "would benefit from individual counseling that is supportive in nature, as well as having a solid component of cognitive behavioral interventions within this structure." Second, DCS provided Mother with individual

counseling at Terros and this program specifically included CBT components, complying with the psychologist's expert recommendation. In addition, we agree with DCS that CBT was not a primary recommendation because it was not directly relevant to the grounds for termination, which were Mother's substance abuse and domestic violence. For all these reasons, DCS's provision to Mother of CBT-related services provides no basis to disturb the court's order severing her parental rights.

### C. DCS Made Reasonable Efforts to Provide Mother Substance Abuse Services, Given That Mother's Providers Only Recommended Residential Care Three Weeks Before the Severance Trial.

¶26 The court found DCS diligently worked to provide Mother with "an array of reunification services" focused on her substance abuse, which would likely have resulted in reunification if completed. Mother does not challenge DCS's provision of services concerning substance abuse through most of the two-and-one-half year period of the reunification plan.

¶27 Mother argues DCS failed to provide her with reasonable substance abuse services in one particular. She complains that while DCS sent her a list of three inpatient substance abuse treatment providers, it did not undertake significant follow-up actions to support her receiving that treatment. *Mary Ellen C.*, 193 Ariz. at 192-93 ¶¶ 35, 42 (explaining that providing parent with a phone number to self-refer in context of matter was not reasonable efforts).

¶28 Mother's argument, however, ignores the factual context. Mother's health care providers did not recommend inpatient substance abuse services until three weeks before the severance hearing. DCS promptly provided Mother with a list of programs in which other candidates had succeeded. But as DCS's case manager testified, time was too short to provide Mother with further assistance. Given Mother's failure to challenge most of DCS's provision of services in this area, and considering the totality of the circumstances, we see no abuse of discretion in the court's conclusion that DCS diligently provided Mother with substance-abuse related reunification services. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23, 26 ¶¶ 49, 69 (App. 2019) (explaining that courts must consider the entire dependency and weigh the totality of the circumstances).

**CONCLUSION**

¶29     The record supports the juvenile court's finding that DCS met its burden through clear and convincing evidence to find statutory grounds to sever Mother's parent-child relationship. *Mary Ellen C.*, 193 Ariz. at 190 ¶ 25. The court's findings of fact properly supported severance. *Id.* For these reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:     AA